J-S01014-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.T.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M. | : | No. 1448 MDA 2016 |

Appeal from the Decree Entered August 8, 2016
In the Court of Common Pleas of Schuylkill County
Orphans' Court at No(s):  A63-124A-16

| | | |
|---|---|---|
| IN RE: J.R.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M. | : | No. 1449 MDA 2016 |

Appeal from the Decree Entered August 8, 2016
In the Court of Common Pleas of Schuylkill County
Orphans' Court at No(s):  A63-123B-16

BEFORE:   GANTMAN, P.J., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED JANUARY 19, 2017**

Appellant, J.M. ("Father"), appeals from the decrees entered in the Schuylkill County Court of Common Pleas Orphans' Court, which terminated Father's parental rights to his two minor children, J.T.M. and J.R.M. ("Children").  We affirm.

In its opinion, the trial court fully sets forth the relevant facts and procedural history of this case.  (**See** Trial Court Opinion, filed August 8, 2016, at 3-9.)  Therefore, we will only briefly summarize them.  H.H.

("Mother") and Father are the natural parents of Children; they were not married. Father was violent and controlling toward Mother and was not involved in Children's lives. After the couple separated in 2011, Father entered Mother's home without her permission, while Mother and Children were sleeping, turned off the furnace, and left. Mother obtained a protection from abuse order based on Father's trespass. Father was convicted for his actions and was placed on probation. Subsequently, Father was arrested for his involvement in a domestic dispute with his wife and was sentenced to a period of incarceration. During Father's incarceration, Father did not contact Children. Thereafter, Mother married D.H. ("Step-Father"), and together they have cared for Children. Following Father's release from prison, Father filed a petition for custody of Children.

On February 25, 2016, Mother filed a petition for termination of Father's parental rights to Children. That same day, Step-Father filed a petition to adopt Children. The court held a termination hearing on June 28, 2016. On August 8, 2016, the court entered a final decree terminating Father's parental rights to Children, awarding Mother and Step-Father custody of Children, and allowing the adoption to proceed without further notice to Father. On September 6, 2016, Father filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) for each child. This Court *sua sponte* consolidated Father's appeals on September 15, 2016.

Father raises the following issues for our review:

> WHETHER THE TRIAL COURT EITHER ABUSED ITS DISCRETION OR COMMITTED AN ERROR OF LAW IN TERMINATING [FATHER]'S PARENTAL RIGHTS PURSUANT TO 23 PA.C.S.A. [§] 2511(A)(1) BY FINDING [MOTHER AND STEP-FATHER] MET [THEIR] BURDEN OF PRESENTING CLEAR AND CONVINCING EVIDENCE THAT [FATHER] HAD BY CONDUCT FOR A PERIOD OF SIX MONTHS OR MORE IMMEDIATELY PRECEDING THE FILING OF THE PETITION EITHER EVIDENCED A SETTLED PURPOSE OF RELINQUISHING HIS RIGHTS OR REFUSED OR FAILED TO PERFORM HIS PARENTAL DUTIES?
>
> WHETHER THE TRIAL COURT EITHER ABUSED ITS DISCRETION OR COMMITTED AN ERROR OF LAW IN DETERMINING THE TERMINATION OF [FATHER]'S PARENTAL RIGHTS WAS IN THE BEST INTEREST, NEEDS AND WELFARE OF…CHILDREN?

(Father's Brief at 4).

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*)*, appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

Mother and Step-Father filed a petition to terminate Father's parental rights on the following grounds.

**§ 2511.  Grounds for involuntary termination**

**(a)   General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of

at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*     \*     \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

Termination under Section 2511(a)(1) involves the following:

To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for…[his] conduct; (2) the post-

- 5 -

abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of…[his] parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

With respect to an incarcerated parent, this Court has stated:

> [I]ncarceration alone does not provide sufficient grounds for the termination of parental rights. Likewise, a parent's incarceration does not preclude termination of parental rights if the incarcerated parent fails to utilize given resources and fails to take affirmative steps to support a parent-child relationship. As such, a parent's responsibilities are not tolled during incarceration.

*In re Adoption of K.J., supra* at 1133 (internal citations omitted).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond,

paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have [his] parental rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert [himself] to take and maintain a place of importance in the child's life.

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his…ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

*In re B.,N.M., supra* at 855 (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of…[his] child is converted, upon the failure to fulfill…[his] parental duties, to the child's right to have proper parenting and fulfillment of…[his] potential in a permanent, healthy, safe environment." *Id.* at 856.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable William E. Baldwin, we conclude Father's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion at 1-10) (finding: **(1)** under Section 2511(a)(1), Father has not fulfilled his parental duties since he last saw Children in April 2011, when they were three and four years old, respectively; Father provided inconsistent and minimal amount of financial support for Children in past five years; Father failed to put himself in position to see Children, but he continues to blame others for his lack of relationship with Children; Father has not sent Children gifts or letters, and

- 8 -

he has not made telephone calls to them; Father did not make affirmative attempts to establish, maintain, or encourage parental relationship with Children; **(2)** regarding Section 2511(b),[1] Children have resided with Mother since birth; Mother has provided for Children's financial, emotional, and physical needs; Children do not ask about Father or think of him as their Father; Children regard Mother's husband, Step-Father, as their father; Step-Father has been involved in Children's lives and testified he does with Children "everything a dad does," including homework, recreational activities, and attending doctors' appointments; Step-Father wishes to adopt Children; Children are doing well in school, are happy, and in good health; no evidence shows Children's needs and welfare are better served by continuing Father's parental rights; instead, it is in Children's best interests to terminate Father's parental rights).   The record supports the court's decision to terminate Father's parental rights to Children, so we see no reason to disturb it.   *See* Pa.C.S.A. § 2511(a), (b); *In re Z.P., supra*. Accordingly, we affirm.

Decrees affirmed.

_____

[1] Father appears to have abandoned this argument in his brief.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/19/2017

COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

In Re:
J. R. M.,

        a Minor

| No. A63-123B-16

| Contested Involuntary Termination

---

In Re:
J. T. M.,

        a Minor

| No. A63-124A-16

| Contested Involuntary Termination

Counsel of Record: Julie A. Werdt, Esquire - for Petitioners
Lora J. McDonald, Esquire - for the Natural Father
Thomas J. Campion, Jr., Esquire – for the Minor Children

## OPINION OF COURT

BALDWIN, P.J.

      H.H. (hereinafter Mother), natural mother, and D.H., her husband, filed a petition to terminate the parental rights of J.M. (hereinafter Father), the natural father of J.T.M. and J.R.M.

      The termination of parental rights is governed by statute. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies at least one of the nine statutory grounds delineated in Section 2511(a) of the Pennsylvania Adoption Act, 23 Pa.C.S.A. §2101 *et seq.* See also **In re I.J.**, *972 A.2d 5, 9 (Pa.Super. 2009).* If the court determines that the parent's conduct warrants termination, it must then engage in an analysis of the best interests of the child pursuant to Section 2511(b) and take into consideration the developmental, physical, and emotional needs of the child. The best interests of the child may not be separately

considered until a finding has been made that the statutory requirements for termination have been met. **In re Adoption of M.R.B.**, *25 A.3d 1247 (Pa.Super. 2011)*.

In this case, petitioners sought the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(1) and Section 2511(b). We find that the petitioners presented clear and convincing evidence that Father's parental rights should be terminated pursuant to Section (a)(1) and (b) which provide as follows:

> The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. **23 Pa. C.S.A. § 2511(a)(1)**.
>
> and
>
> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child . . . . **23 Pa. C.S.A. § 2511(b)**.

Parental rights may be terminated if, for a period of at least six months, a parent either demonstrates a settled purpose of relinquishing a parental claim to a child or refuses or fails to perform parental duties. **In re Adoption of R.J.S.**, *901 A.2d 502 (Pa.Super. 2006)*. Section 2511(a)(1) does not require that the parent demonstrate both a settled purpose and a refusal or failure to perform parental duties. **In re Z.S.W.**, *946 A.2d 726, 730 (Pa.Super. 2008)*. Although it is the six month period immediately preceding the filing of the petition to terminate the parental rights that is most critical to the analysis, the trial court can and should "consider the whole history of a given case." **In re Interest of A.P.**, *692 A.2d 240, 245 (Pa.Super. 1997)*.

With respect to parental duties, as required by the language of Section 2511 (a)(1), there is no simple or easy definition and they have been defined as "many sided." **In re Adoption of M.J.H.**, *501 A.2d 648, 652 (Pa.Super. 1985)*, *appeal denied, 522 A.2d 1105 (Pa. 1987)*. Not only is there a duty to love, to protect, and to financially support one's child, there is also a duty to maintain

communication and association with that child. **In re Burns**, *379 A.2d 535 (Pa. 1977)*. Further, being a parent is not just a passive state of mind, it is "an active occupation, calling for a constant affirmative demonstration of parental love, protection, and concern. **In re Adoption of Baby Boy J**, *512 A.2d 689, 691(Pa.Super. 1986)*.

Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his financial, physical, and emotional needs. **In re Z.P.**, *994 A.2d 1108 (Pa.Super. 2010)*. As we have repeatedly acknowledged, a child's life "simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." **In re Z.S.W.**, *supra*. A parent who cannot, or will not, meet the minimum requirements of care within a reasonable time may properly be considered unfit and have his parental rights terminated. **In re Z.P.**, *supra*.

However, failure or refusal to perform parental duties should be measured "in light of what would be expected of an individual in similar circumstances" to the parent under examination. **Lookabill v. Moreland**, *485 A.2d at 1204, 1206 (Pa.Super. 1984)*. The totality of the circumstances surrounding the failure to perform parental duties must be considered, including the effect of certain barriers on the contact between the parent and the child. **In re Z.P.**, supra. It is well-established that the court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances warrants the involuntary termination. **In re C.M.S.**, *832 A.2d 457 (Pa.Super. 2003)*.

Mother and Father were never married and terminated their relationship in January 2011 when the boys were about three and four years old. Mother testified that she ended the relationship because Father was "violent and controlling" and

3

often hit or choked her. [N.T., p. 4]. Mother testified that when the couple was together as a family, Father was never really involved with the boys and when they separated, Father agreed that he should only see the boys at supervised visits at his mother's home. Several visits were scheduled and, although Mother dropped the boys off at Father's mother's home, Mother testified that she was never sure that Father spent any significant amount of time with them while they were there.

On March 23, 2011, Mother obtained a Final Protection From Abuse (PFA) Order against Father because of an incident that had occurred earlier in the month. Mother testified that Father had entered her home through a basement window, came into her bedroom, turned off the furnace and left. Father testified that he had only gone to the home because Mother had called him and told him that the boys were ill. When he got to the home, the front door was locked, and because he was so concerned about the boys, he broke into the home through the window. Father denied turning off the furnace and said that he only visited the boys' room to see that they were okay. The PFA permanently evicted Father from the residence and prohibited him from having any contact with Mother except to arrange his supervised visits. The PFA also required that the supervisor agree to be accountable to the court, execute an affidavit of accountability, and file the affidavit before any visits could begin. Father was required to have no drugs or alcohol for at least twelve hours prior to or during his periods of visitation. The custody provisions in the PFA order would lapse unless a complaint or petition to modify custody was filed within thirty days. Father was prohibited from stalking or harassing K.L. (Mother's mother) and C.B. and Z.B. (Mother's other children). Neither Mother nor Father filed a custody action within the thirty day period.

On February 22, 2012, Father pled guilty to criminal trespass, as well as to DUI high rate and possession of marijuana, for the incident that had occurred at Mother's home and prompted her to seek the PFA.

4

Subsequently, on June 24, 2012, Father was arrested and charged with aggravated assault, simple assault, resisting arrest, and disorderly conduct against a police officer. Those charges were filed against Father after the police were called to his and his wife's home because he had "trashed" the house, and when the police arrived, he got into a physical altercation with them. [N.T., p. 7]. Father's probation on the prior charges was revoked due to new pending charges. He was found guilty of disorderly conduct at trial.

A custody conference was held in July 2012 and because Father was incarcerated at the time, he participated via telephone. In her report dated July 6, 2012, Custody Conciliation Officer, Diane Hitzemann, concluded that a full custody trial was necessary and that Father should be required to undergo a psychological evaluation before the trial was held. An interim custody order, dated July 9, 2012, incorporated those recommendations, as well as awarding sole legal and physical custody to Mother.

On August 10, 2012, Father was sentenced to 1 to 2 years in state prison with 25 days credit. A subsequent custody order, dated August 28, 2012, awarded sole legal and physical custody to Mother and indicated that Father had no partial physical custody of the boys until he completed a psychological evaluation after being released from prison. He was required to file a petition to modify custody upon completion of the mental health evaluation in order to reinstate any custody rights.

Father was released from prison on July 23, 2014. He served his entire sentence and when asked about why he served the entire sentence, Father testified that he had been offered and granted parole at one point, but before he was released on parole, he was told that his parole was revoked because he had said "inappropriate things" to his wife on a visit. [N.T., p. 91].

Father filed a petition to modify custody on December 4, 2014, about six months after his release from prison, and a custody conciliation conference was held in

5

February 2015. At the conference, Father submitted a personality assessment inventory completed on September 9, 2012, while he was incarcerated and a psychological evaluation completed in December 2014 by a private provider. The psychological evaluation indicated that he had been diagnosed with a mood disorder, personality disorder, and moderate to severe stressors and recommended that Father needed lengthy psychiatric treatment with an experienced therapist.

A child support hearing was held in late fall 2015. Father presented a note from a physician indicating that he was suffering from back pain and he had filed for Social Security disability benefits. His support obligation was suspended. Mother testified that she approached Father and asked if he would voluntarily relinquish his parental rights to the boys. Father testified that he told her that he would never "sell" his boys. [N.T., p. 73]. Following the child support hearing, in December 2015, Father filed a petition to modify custody which was subsequently stayed because Mother had filed a petition to terminate his parental rights on February 25, 2016.

In the six month period just before the filing of the petition to terminate his parental rights, Father did pay some child support, but it is not clear exactly how much and when. We do know that although he was court ordered to pay support beginning in 2011, there was a two year period that he did not pay any support because he was incarcerated and had requested that the obligation be suspended because he would not be able to pay. After his release from prison in July 2014, his support obligation was reinstated, but soon after that Father stopped working due to back pain. Father testified that it had been "difficult" to secure employment after being in prison and that the "few jobs" he had "became very stressful" on his back. [N.T., p. 72]. Sometime by late 2015, his obligation was suspended and the arrearages vacated because he notified the Domestic Relations Office that he had applied for Social Security disability benefits. Father testified that he had not been consistent with child

6

support payments over the years and was not sure of how much and for how long he had paid stating that "whenever I had money, that's where it went." [N.T., p. 71].

Additionally, in the six month period prior to the filing of the petition to terminate his parental rights, we note that Father ' did file a petition to modify custody the same day as the petition to terminate his rights was filed, and just weeks after Mother had asked him if he would voluntarily give up his parental rights. Mother testified and Father never disputed the fact that in that time period he never asked about the boys, never asked to re-start his supervised visits, and never tried to contact his children. By filing such a petition, Father may have demonstrated a desire to pursue his parental rights, but such a desire seems to be more so as a property right to his boys rather than any desire or willingness to fulfill his parental duties.

Father knew that he was required, since 2012, to submit to a psychological evaluation and file it with the court in order to restore any of his custody rights. He failed to submit proof of an evaluation until a January 13, 2015, custody conference even though he had had an evaluation while incarcerated in 2012 and a second one completed in December 2014. When asked why he waited a year after having the second psychological evaluation to file for custody, he testified that he had "tried filing...for a modification for this, you know, prior to prison" which was unresponsive to the question. [N.T., p. 79]. A series of questions was then asked of Father , but after many unresponsive and sketchy answers, he finally replied that he did not "have an answer" as to why he waited over a year to file his petition. [N.T., p. 79].

More importantly, and despite the professional's recommendation that Father needed lengthy "intensive therapy" due to his diagnosis, Father testified that such a recommendation was just the professional's "opinion" and that he disagreed with the recommended treatment because he did not "have time for that." [N.T., p. 69]. Further, he testified that he could not afford such treatment because he was "geared up for knowing that [he] had support to pay" and was "attempting to secure employment."

7

[N.T., p. 70]. Father claimed that if he needed psychotherapy or mental health treatment it was due to his incarceration and "having been withheld from [his] sons' lives." [N.T., p. 75]. He stated that he needed "as much treatment as their mother" needed. [N.T., p. 76].

Father testified that the batterers' program in prison did help him because it was very informative as to identifying the "the other party's actions" and that he learned that it "takes two people to have an argument." [N.T., p. 77]. Despite his history of violence against Mother, his home, a police officer, and his wife (for which there are pending charges), Father has refused to acknowledge his tendency for such behavior, and continues to blame others. His violent tendencies have caused him to spend a significant time in prison. Father tried to explain his failure to make contact with his sons while he was incarcerated by testifying that it was a "little difficult" to contact anyone from prison because he was not allowed to phone anyone without having them pre-approved. [N.T., p. 63]. He stated that he had no current phone number for Mother, was prevented from contact with her or his boys because of the PFA, and it was "not an option" for him to write to them or send them cards. [N.T., p. 64]. Father offered no explanation as to why it was no option to send a note nor did he describe any concrete steps he took to have a relationship with them.

Father testified that he did not want his rights terminated and that he was now willing to do whatever he needed to do to be in his sons' lives. A parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated. **In re C.M.S.**, *supra*. at 464. Father stated that he had been "shut out at every length, every attempt" that he made to be reinstated in their life. [N.T., p. 74]. He also testified that he felt that he had been "stonewalled", but did not identify who in particular was responsible for thwarting his attempts or how exactly he had been prevented from having a relationship with his boys. [N.T., p. 74]. Mother did admit that she had moved and that about five years after she and Father separated she got a different

8

phone number; but absent from the evidence is testimony that Father ever tried to telephone her, or that he had attempted to contact her at the home, but she was not there. Father reported that he had no address for Mother, but all of his documents were successfully served upon her during the time period from January 2011 through today. We find that there was no evidence to support his argument that he was prevented from establishing a relationship with J.T.M. and J.R.M.

Father has done nothing to fulfill any of his parental duties since he last saw the boys in April 2011. He has provided only a minimal amount of inconsistent financial support in the past five years. Father has failed to put himself in a position to be able to see his children and stubbornly clings to his assertion that he is not to blame for the lack of a relationship. He has sent no gifts or letters and made no telephone calls. He took no affirmative actions to establish, maintain, or encourage a parental relationship with the boys.

In deciding the sensitive question of the involuntary termination of parental rights, we are mindful of the irreversible nature and the serious emotional impact which necessarily follow such an action. **In re Adoption of Ostrowski**, *471 A.2d 541 (Pa.Super. 1984)*. It is well-established that the court must engage in a bifurcated process in terminating parental rights. **In re D.W.**, *856 A.2d 1231 (Pa.Super. 2004)*. Initially, the court must focus on the conduct of the parent, and only after determining that the parent's conduct warrants the termination of parental rights does the court engage in the second part of the analysis, that is, determining the needs and welfare of the child under the standard of the best interests of the child. **In re C.L.G.**, *956 A.2d 999 (Pa.Super. 2008)*. A major aspect of the needs and welfare analysis concerns the "nature and status of the emotional bond between parent and child." **In re Adoption of R.J.S.**, *supra.* at 509 (citation omitted).

J.R.M. and J.T.M. have resided with Mother since their birth and she has provided for their financial, emotional and physical needs. They boys have not seen

9

*Father* since April 2011 when they were about three and four years old. They have had no contact whatsoever since that time. Because they were so young when *Father* last saw them, they do not ask about him or think of him as their father, and regard *Mother's* husband, D. H., as a father. D. M. has been involved in the boys' lives for a significant amount of time and testified that he does "everything a dad does," including homework, baseball, fishing, football, and hunting. [N.T., p. 47]. He also attends their medical and dental visits. J.R.M. and J.T.M. are in good health and are happy. They are doing well in school. D. M. is interested in adopting the boys.

We conclude that there is no evidence showing that the minor children's needs and welfare are better served by continuing *Father* parental rights. Instead, the termination of the parental rights of the natural father, *Father*, is in the best interest, needs, and welfare of the minor children, J. R. M. and J. T. M.

Accordingly, we enter the following:

10

## COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY, PENNSYLVANIA
## ORPHANS' COURT DIVISION

In Re:
J. R. M.
          a Minor

| No. A63-123B-16

|

|

| Contested Involuntary Termination

---

In Re:
J. T. M.
          a Minor

| No. A63-124A-16

|

| Contested Involuntary Termination

Counsel of Record: Julie A. Werdt, Esquire - for Petitioners
                          Lora J. McDonald, Esquire - for the Natural Father
                          Thomas J. Campion, Jr., Esquire – for the Minor Children

## FINAL DECREE

BALDWIN, P.J.

AND NOW, this 8th day of August, 2016, at 3:00 p.m., upon consideration of the within Petition and after hearing held thereon, it is ORDERED, ADJUDGED AND DECREED that all parental rights of J. M., as natural father, in and to J. R. M., a male minor, are TERMINATED.

It is further ORDERED, ADJUDGED AND DECREED that all parental rights of J. M., as natural father, in and to J. T. M., a male minor, are TERMINATED.

Custody of the said J. R. M. and J. T. M. is hereby awarded to H. H. and D. H., her husband, and the adoption of the said children shall proceed without further notice to the natural parent.

It is also directed that all papers in this case and the testimony shall be withheld from public inspection and no person shall be allowed access thereto except upon Order of Court granted upon cause shown.

BY THE COURT,

_____

STATE OF PENNSYLVANIA
COUNTY OF SCHUYLKILL

Certified from the Record as
a true and correct copy this

8th day of Aug 2016

Register of Wills and
Clerk of Orphans Court

2